LAW OFFICES OF KYLE KUBISCH
Kyle Kubisch (State Bar No. 203981)
18101 Von Karman, Suite 330
Irvine, CA  92612-0146
Telephone:  949-225-4475
Facsimile:  949-225-4476
kkubisch@kubischlaw.com

Attorneys for Plaintiff
AMY JACKSON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| AMY JACKSON,<br><br>          Plaintiff,<br><br>     v.<br><br>COLLATERAL GROUP, INC., a California corporation; ERIC S. HART; ERIC L. KEILLOR; NEIL R. ANENBERG, TRUSTEE OF THE NEIL R. ANENBERG IRREVOCABLE TRUST, STEVEN B. ANENBERG, TRUSTEE OF THE STEVEN B. ANENBERG IRREVOCABLE TRUST, U/A DATED AUGUST 11, 1994 and JEFFREY L. ANENBERG<br><br>          Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL EQUAL CREDIT OPPORTUNITY ACT**<br><br>JURY TRIAL DEMANDED |

1. Plaintiff Amy Jackson, for her Complaint against Defendants Collateral Group, Inc., Eric S. Hart, Eric L. Keillor, Neil R. Anenberg, Trustee of The Neil R. Anenberg Irrevocable Trust, Steven B. Anenberg, Trustee of The Steven B. Anenberg Irrevocable Trust, u/a dated August 11, 1994 and Jeffrey L. Anenberg (collectively "Defendants"), alleges as follows:

## PARTIES AND KEY INDIVIDUALS

2. Plaintiff Amy Jackson ("Mrs. Jackson") is an individual resident and citizen of Orange County, California. Mrs. Jackson is the spouse of Schuyler Jackson.

3. Schuyler Jackson ("Mr. Jackson") is an individual resident and citizen of Orange County, California. Mr. Jackson is the Manager and, through a trust, the sole member of Cherry Valley Ranch, LLC.

4. Cherry Valley Ranch, LLC ("Cherry Valley") is a California limited liability company.

5. Defendant Collateral Group, Inc. is a California corporation with its principal executive offices in Newport Beach, California and doing business in the State of California.

6. Defendant Eric S. Hart is an individual resident and citizen of Orange County, California. Mr. Hart is a principal of Collateral Group. Upon information and belief, Mr. Hart is a licensed broker, but did not receive his license until March 22, 2013.

7. Defendant Eric L. Keillor is an individual resident and citizen of Orange County, California. Mr. Keillor is a principal of Collateral Group. Upon information and belief, Mr. Keillor is a licensed broker and has had such license at all relevant times.

8. Upon information and belief, Defendant Neil R. Anenberg, Trustee of The Neil R. Anenberg Irrevocable Trust, is an individual residing in Orange County California and is the Trustee of the aforementioned trust.

9. Upon information and belief, Defendant Steven B. Anenberg, Trustee of The Steven B. Anenberg Irrevocable Trust, u/a dated August 11, 1994 and is the Trustee of the aforementioned trust.

10. Upon information and belief, Jeffrey L. Anenberg is an individual.

11. The Defendants are the agents, servants, representatives, employees, partners, joint venturers, alter egos, and/or co-conspirators of each other Defendant and were acting within the scope of such relationship in committing the wrongful acts or omissions alleged herein that caused and continues to cause Mrs. Jackson damages, and/or is otherwise liable or legally responsible to Mrs. Jackson for each of the wrongful acts and omissions alleged in this Complaint by virtue of their actions and/or relationship to each other, and in doing the things alleged herein approved and/or ratified each other's conduct.

## JURISDICTION AND VENUE

12. This Court possesses jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this matter arises out of federal law under 15 U.S.C. § 1691(a) and 12 C.F.R. § 202.7.

13. The Defendants are subject to the jurisdiction of this Court by transacting business in the State of California, and because a substantial number of transactions giving rise to claims in this action occurred in the State of California.

14. Venue is proper in this Court because a substantial part of the transactions giving rise to claims in this action occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

15. At the hands of Defendants, Mrs. Jackson was the unknowing victim of various illegal violations and unjust enrichment schemes.

16. Cherry Valley is the owner of certain real property located in the County of Riverside (the "Property").

17. In late 2012/early 2013, Cherry Valley sought to procure a $2 million loan in regard to the Property from Collateral Group (the "Loan"). The Loan is subject to the provisions of the Equal Credit Opportunity Act ("ECOA"). Collateral Group represented that it was a licensed broker and that it could fund the Loan and/or obtain funding from its funding sources to do so. The communications between Cherry Valley and Collateral Group during this period were between Mr.

Jackson and Mr. Hart/Mr. Keillor. It has since been determined that Mr. Hart did not hold a broker's license during the period the Loan was arranged and has never been designated as an officer of Collateral Group with the California Bureau of Real Estate.

18. In January 2013, Mr. Hart and Mr. Keillor advised Cherry Valley that it would fund the Loan, if Mr. Jackson provided a personal guaranty.

19. In late January/early February 2013, Cherry Valley provided a Uniform Residential Loan Application to Collateral Group (the "Application"). The Application identified Cherry Valley as the "Borrower" and Mr. Jackson as the "Co-Borrower." Following the submission of the Application, Collateral Group assured Cherry Valley that the Loan would fund. At no time did the Defendants advise Cherry Valley or Mr. Jackson of any adverse action related to the Application.

20. 15 U.S.C. § 1691a(b) defines "applicant" as ". . . any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit."

21. 15 U.S.C. § 1691a(c) defines "Bureau" as "the Bureau of Consumer Financial Protection."

22. 15 U.S.C. § 1691a(g) provides that "[a]ny reference to any requirement imposed under this subchapter or any provision thereof includes reference to the regulations of the Bureau under this subchapter or the provision thereof in question."

23. Regulation B issued by the Board of Governors of the Federal Reserve System and adopted by the Bureau interprets "applicant" to include a spouse-guarantor.

24. 15 U.S.C. § 1691a(e) defines "creditor" as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit."

25. Collateral Group and Messrs. Keillor and Hart are creditors pursuant to Section 1691a(e) as they regularly extended, renewed or continued credit and/or regularly arranged for the extension, renewal, or continuation of credit.

26. On January 25, 2013, Collateral Group obtained an appraisal of the subject property through an appraiser of its choosing. The appraisal concluded that the "as is" value of the Property as of January 23, 2013 was $6,125,000. This was $4 million more than the amount of the Loan.

27. Unbeknownst to either Mr. Jackson or Mrs. Jackson, at some point, the Defendants ran Mrs. Jackson's credit. The Defendants did so without Mrs. Jackson's prior knowledge or consent.

28. On or about February 20, 2013, upon the Defendants' request, Mr. Jackson and Mrs. Jackson appeared at an escrow office to execute closing documents. Mr. Jackson was advised that his wife needed to accompany him.

29. On that date, Cherry Valley provided a Promissory Note to the Annenberg Defendants in the principal amount of $2,000,000 (the "Note") that was purportedly arranged by the Collateral Group. In order to charge an interest rate that would otherwise violate the usury laws of this State, the Note recites that it was "arranged by a licensed California real estate broker." According to a Mortgage Loan Disclosure Statement ("MLDS") provided to Cherry Valley, the broker was Collateral Group, through its representative, Mr. Keillor. The Note also incorrectly indicated that Cherry Valley was the trustor of the Jacksons' family residence.

30. In addition to the Note, the Jacksons were provided a document entitled "Loan Guaranty" in favor of the Anenberg Defendants. The Guaranty identified both Mr. Jackson and Mrs. Jackson as guarantors. Prior to the presentation of the Guaranty, the Defendants never advised Cherry Valley that it did not qualify for the Loan or that Mr. Jackson's guaranty was insufficient. Nor were the "Borrower" or "Co-Borrower" advised of an adverse action.

31. In addition to the Note and Guaranty, Cherry Valley executed a Deed of Trust related to the Property and the Jacksons executed a Deed of Trust securing the Guaranty with their personal residence of over twenty-five years. Collectively, the Note, the Guaranty and the Deeds of Trust are referred to herein as the "Loan Documents."

32. In addition to the Loan Documents, a second Uniform Residential Loan Application was included within the stack of documents provided at the closing (the "Second Application"). The Second Application did not identify Cherry Valley as the Borrower. Instead, it identified Mr. Jackson as the "Borrower" and Mrs. Jackson as a "Co-Borrower." The Second Application, which appears to include items referenced in Mrs. Jackson's credit, was not prepared by Cherry Valley or the Jacksons. On information and belief, Mrs. Jackson believes that the Defendants ran her credit without her prior knowledge or authorization and that they prepared the Second Application.

33. Contrary to what is referenced in the Second Application, Mr. Jackson is not the Borrower as it relates to the Note. The Borrower under the Note is Cherry Valley.

34. At no time prior to the execution of the Loan Documents, did the Defendants advise Cherry Valley that it did not qualify for the Loan or ever request a guaranty from anyone other than its Manager, Mr. Jackson.

35. Federal law prohibits the Defendants from requiring Mrs. Jackson to guarantee the Loan to Cherry Valley solely because she is Mr. Jackson's spouse.

36. Without so much as denying credit to Cherry Valley or Mr. Jackson, Defendants obtained a guarantee from Mrs. Jackson based solely on her marital status to Mr. Jackson, despite the fact that Mrs. Jackson held no personal ownership interest in Cherry Valley.

37. At the time the Loan Documents were executed, Mrs. Jackson was neither a Borrower nor Co-Borrower under the Note. Nor was she a member or manager of Cherry Valley.

38. Defendants never determined that Cherry Valley failed to qualify for the Loan.

39. Defendants never determined that Mr. Jackson, as a guarantor, failed to qualify as a guarantor for the Loan.

40. Despite having failed to determine that the Loan was not adequately collateralized or advising of any adverse action, Defendants forced Mrs. Jackson to execute a guaranty of the Loan to Cherry Valley.

41. Not long after the Loan closed, Cherry Valley was advised that Collateral Group had decided to dissolve and that Messers. Hart and Keillor had a falling out and were primarily communicating with each other through attorneys. At or around this time, Collateral Group had discussions with Cherry Valley whereby it would refinance the Loan through another lender due to the fallout among the principals of Collateral Group.

42. In 2014, Cherry Valley contacted Mr. Keillor to request the release of three lots at the Property to facilitate the closing of a construction loan. As discussed with Mr. Keillor, the proceeds of the construction loan would be used, among other things, to replenish the interest reserve related to the Loan. Cherry Valley sent a letter to Collateral Group on September 8, 2014 memorializing that request.

43. Upon receipt of Cherry Valley's correspondence, Mr. Keillor directed Collateral Group to initiate Cherry Valley's request. Unfortunately, Cherry Valley's request was rejected by the Defendants, apparently at the behest of Mr. Hart and the Annenberg Defendants. Mr. Keillor noted, in an e-mail forwarded to Cherry Valley that Mr. Hart "takes many liberties and assumptions he shouldn't." Mr. Keillor further lamented to Cherry Valley that "this is typical of dealing with Hart."

**COMPLAINT**

44. Instead of working with Cherry Valley to address the concerns raised in its September 8, 2014 correspondence, Defendants caused a demand letter to be sent to Cherry Valley, Mr. Jackson and Mrs. Jackson (care of her husband at Cherry Valley's address), demanding payment and threatening to foreclose on the subject property owned by Cherry Valley and the Jackson family home. Specifically, the letter, dated September 15, 2014, but received on September 22, 2014, threatened, among other things, to "seek all legal remedies" against Mrs. Jackson based upon her execution of the Guaranty.

45. On September 24, 2015, Mr. Jackson contacted Collateral Group and reaffirmed that Cherry Valley wished to buyout, and obtain partial release of, the three lots in order to record a construction loan which would make the loan current and would replenish the Loan's interest reserve. In any event, Cherry Valley advised that it would bring the Loan current by the end of the month in accordance with the "Notice" provision of the Guaranty ["[a]ny notice given by any party under this Guaranty shall be effective only upon its receipt by the other party and only if (a) given in writing and (b) personally delivered or sent by United States mail . . ."].)

46. On September 26, 2015, Cherry Valley sent a letter to Collateral Group advising that its threat to file Notices of Default would disrupt plans to facilitate lot sales, that it was not clear why the demand letter was referring to "Bridge Loan Financial", that the Note contained an error as Cherry Valley was not and has never been, the trustor of the family residence. Cherry Valley asked to meet with the Defendants to discuss.

47. Upon not hearing anything from the Defendants, Mr. Jackson personally delivered a cashier's check in the amount of $42,166.38 to Collateral Group on September 30, 2014. This was within the ten day cure period to avoid imposition of the "Default Rate" set forth in Section 6 of the Note. However, the Defendants refused to accept the check and then claimed the next day (October 1, 2014) that "the

1  default recorded yesterday before you came in with your payment and there was no way to stop it."

48. As it turns out, Defendants caused separate Notices of Default to be recorded against property owned by Cherry Valley and the personal residence owned by Mr. and Mrs. Jackson for different amounts and dated September 26, 2014. The Deed of Trust related to the Jacksons' residence was based upon the Guaranty the Defendants forced Mrs. Jackson to sign.

49. Thereafter, Cherry Valley received a Payment Statement from the Defendants' servicing agent, FCI Lender Services, Inc. ("FCI"), stating that the amount of $111,508.27 was due on December 1, 2014 and was to be paid directly to FCI.

50. On November 25, 2014, in order to mitigate the damage caused by the Defendants' recording of the Notices of Default, Cherry Valley provided the Collateral Group a courtesy copy of a cashier's check in the amount of $111,508.27 made payable to FCI.

51. On December 1, 2014, Collateral Group sent an e-mail to Cherry Valley advising that the sum of $111,508.27 could not be paid (despite what was demanded in FCI Payment Statement) and that it would need to go through a reinstatement process. On December 2, 2014, the Defendants then caused their agent, California TD Specialists, to send a "Reinstatement Quote" to Cherry Valley and the Jacksons demanding $168,791.80, over $57,000 more than was actually due in order to reinstate and to withdraw the Notices of Default. This "Reinstatement Quote" was signed by Mr. Hart. It is believed that Mr. Keillor and a "loan servicing agent" retained by Collateral Group (Poppy Moore) refused to execute the Reinstatement Quote.

52. On December 8, 2015, Cherry Valley sent a letter to Collateral Group noting the impropriety of the events, including the remarkable sum of $60,000 in "default interest" that the Defendant sought to charge.

9
**COMPLAINT**

53. On December 10, 2015, Mr. Jackson personally delivered the sum of $168,791.80 to FCI in order to avoid foreclosures, including the loss of the Property. Despite that payment, the Defendants refused to withdraw their demand for default interest. As further discussed below, Mrs. Jackson now believes that Collateral Group and its principals were, and continue to, receive portions of Cherry Valley's monthly payment.

54. Defendants knew or should have known any claim of indebtedness against Mrs. Jackson based upon the Guaranty was improper and subject to, among other things, violations of the ECOA.

55. Defendants knew or should have known that requiring Mrs. Jackson to personally guarantee the Note was improper and a violation of the ECOA.

56. The MLDS issued does not state how Collateral Group's compensation was derived, nor was such separately itemized given its stated role as the loan broker in the transaction. For example, line 801 of the MLDS references a "Lender's Loan Originating Fee", but indicates that no "Mortgage Broker Commission/Fee" was paid. The MLDS provides that this Fee was paid to someone other than Collateral Group.

57. Cherry Valley has since learned that the Collateral Group and Messrs. Keillor and Hart had an undisclosed servicing agreement in place with the Anenberg Defendants. As fiduciaries, Collateral Group and Messrs. Keillor and Hart had an obligation and duty to disclose its/their servicing agreement with third parties, as well as any conflicts of its principals. Mrs. Jackson, on information and belief, understands Collateral Group and/or Messrs. Keillor and Hart have received, and continue to receive, portions of Cherry Valley's monthly payments, are to share in any late and default interest fees (e.g., Messers. Keillor and Hart are believed to have each received $15,000 of the $60,000 in "default interest" paid after Collateral Group refused to accept Cherry Valley's payment) and are to share equally in any monies derived from default, foreclosure or judgment. Collateral Group and Messrs. Keillor

and Hart refuse to provide whatever servicing agreement exist between it (or its principals) and the Annenberg Defendants.

## FIRST CAUSE OF ACTION

## VIOLATION OF THE FEDERAL EQUAL CREDIT OPPORTUNITY ACT

58. Mrs. Jackson fully incorporates and restates each and every allegation above as though set forth fully herein.

59. Based upon the Defendants' requirement that Mrs. Jackson execute the Guaranty and the Defendants' surreptitious preparation of the application identifying her as a "Co-Borrower," Mrs. Jackson is an applicant as that term is defined in 15 U.S.C. § 1691a(b).

60. The Defendants are "creditors" as that term is defined in 15 U.S.C. § 1691a(c).

61. The Defendants' actions of forcing Mrs. Jackson to personally guarantee the Note is a violation of the ECOA, 15 U.S.C. §§ 1691-1691f, et seq., under which no applicable exception exists.

62. Mrs. Jackson has no membership interest, stock, unit interest or professional involvement in Cherry Valley now or prior to the Loan.

63. Collateral Group communicated only with Mr. Jackson. Neither Mr. Jackson nor Mrs. Jackson have communicated with the Anenberg Defendants. None of the Defendants appeared at the escrow office at the time the loan documents were executed.

64. Mrs. Jackson never communicated with any Defendant as to the terms of the Loan Documents, the provision of credit to Cherry Valley or any need for her to guarantee the Loan.

65. Mrs. Jackson was not invited to participate in any negotiation process related to the Loan Documents.

66. During the negotiations and discussions related to the Loan, Mr. Jackson never offered nor suggested that Mrs. Jackson would or could additionally serve as a personal guarantor of the Loan.

67. Cherry Valley qualified independently for the Loan.

68. Mr. Jackson qualified independently and to serve as a Guarantor for the Loan.

69. Without so much as providing any explanation, on February 20, 2013, commensurate with the closing of the Loan and execution of the Loan Documents, the Defendants, presented Mr. Jackson and Mrs. Jackson a copy of the Guaranty and required Mrs. Jackson to serve as a personal guarantor for the Loan to Cherry Valley. The Defendants did so with the purpose of making both Mr. Jackson and Mrs. Jackson jointly and severally liable to them.

70. The Guaranty did not limit Mrs. Jackson's potential liability to her interest jointly held with Mr. Jackson.

71. The Defendants did not advise Mrs. Jackson that her execution of the Guaranty was not legally or properly required.

72. In requiring the Guaranty from Mrs. Jackson, the Defendants discriminated against Mrs. Jackson on the basis of marital status. Such acts constitute a violation of the ECOA, 15 U.S.C. § 1691(a) and of Regulation B, 12 C.F.R. §202.7.

73. Upon discovering the Defendants' improper actions, demand was made for release of Mrs. Jackson from the Guaranty. Collateral Group, acting as the agent for the Anenberg Defendants, refused and claimed that it was appropriate to require Mrs. Jackson to execute the Guaranty because she co-owned the family residence. What the Defendants ignored, however, is that such an argument has been expressly rejected by the Court of Appeal in *Ballard v. Bank of America* (4th Cir. 2013) 734 F.3d 308.

74. Mrs. Jackson's signature on the Guaranty is void under the ECOA.

75. There exists a justiciable controversy between the parties which this Court may adjudicate.

76. As a direct and proximate result of the Defendants' conduct by the Defendants, Mrs. Jackson has suffered damage, including, but limited to, monetary losses, injury to credit reputation, and mental anguish, humiliation, or embarrassment.

77. Mrs. Jackson is entitled to equitable and declaratory relief from the Court pursuant to 15 U.S.C. § 1691e (c) in that the Defendants required her to incur personal liability on an obligation and debt contrary to provisions of federal law. Thus, Mrs. Jackson has no liability under the claimed Guaranty.

78. Mrs. Jackson is also entitled to punitive damages pursuant to 15 U.S.C. § 1691e(b).

79. Mrs. Jackson is also entitled to recover the costs of this action together with a reasonable attorneys' fee pursuant to 15 U.S.C. § 1691e (d).

## PRAYER FOR RELIEF

WHEREFORE, Mrs. Jackson prays for judgment in her favor and against Defendants as follows:

1. actual damages sustained pursuant to 15 U.S.C. § 1691e(a) and 12 C.F.R. § 202.17(b) in excess of $75,000;

2. punitive damages pursuant to 15 U.S.C. § 1691e(b) and 12 C.F.R. § 202.1 (b);

3. an order from this court in favor of Mrs. Jackson and against the Anenberg Defendants declaring as void the purported Guaranty and declaring that Mrs. Jackson is not liable on the purported Guaranty pursuant to 15 U.S.C. § 1691e(c) and 12 C.F.R. § 202.17(b);

4. an injunction precluding the Defendants from foreclosing on the Deed of Trust related to the family residence based upon Mrs. Jackson's purported status as a guarantor;

5. Mrs. Jackson's costs and reasonable attorneys' fees incurred pursuant to 15 U.S.C. § 1691e(d) and 12 C.F.R. § 202.17 (b); and

6. such other and further relief as this Court deems just and proper.

**JURY TRIAL DEMANDED**

Date: September 10, 2015        LAW OFFICES OF KYLE KUBISCH


By:  /s/  Kyle Kubisch
KYLE KUBISCH
Attorneys for Plaintiff AMY JACKSON

**DEMAND FOR JURY TRIAL**

PLEASE TAKE NOTICE that Plaintiff, AMY JACKSON, hereby demands a trial by jury of all triable issues of fact in the above-captioned case.

Date: September 10, 2015           LAW OFFICES OF KYLE KUBISCH


By:  /s/  Kyle Kubisch
KYLE KUBISCH
Attorneys for Plaintiff, AMY JACKSON